USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/16/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\-------------------------------------------------------- X
                                    :

UNITED STATES,                :

                                      :

                                      :

        -v-           :                 1:17-cr-668-GHW

                                      :

BENJAMIN TIRADO,         :       MEMORANDUM OPINION AND

                                      :             ORDER

                           Defendant.   :

                                        :

\-------------------------------------------------------- X

**GREGORY H. WOODS**, United States District Judge:

      Defendant Benjamin Tirado is charged in a one-count indictment with possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 2. Indictment (ECF No. 6). Defendant has moved to suppress physical evidence obtained during a July 25, 2017 search of his grandparents' apartment, where Defendant also resides. That evidence includes a Hi-Point .380 caliber pistol and ammunition. Defendant also moves to suppress a statement that he made to the police immediately following the search of the apartment, in which Defendant notified the officers of the location of the gun. He also seeks suppression of a post-arrest statement that he gave to detectives at the police precinct. The Court held an evidentiary hearing in connection with Defendant's motion. Because Defendant's grandfather gave voluntary consent to a search of his apartment, Defendant's motion to suppress the ammunition is denied. Defendant's motion to suppress the other evidence is also denied because both of Defendant's statements to the police were voluntarily given and the second statement was not the result of a deliberate two-step interrogation.

## I.    BACKGROUND

### A.  Defendant's Affidavit

In support of his motion to suppress, Defendant has submitted his affidavit.  ECF No. 28 ("Tirado Aff.").  According to that affidavit, on July 25, 2017, Defendant was talking to people he knew outside of 2411 Valentine Avenue when he was approached by law enforcement officers.  *Id.* ¶¶ 2-3.  The officers separated Defendant from his friends.  *Id.* ¶ 3.  Officers then surrounded Defendant.  *Id.*  He could not walk away from the officers.  *Id.*  Defendant remained surrounded by the officers "for quite some time."  *Id.* ¶ 4.

While still surrounded by other officers, another officer approached Defendant.  *Id.* ¶ 5.  No police officer provided Defendant with *Miranda* warnings.  *Id.* ¶ 7.  That officer informed Defendant that the police had searched for a gun "upstairs" but had not found one.  *Id.* ¶ 5.  The officer explained that Defendant "had to show them where the gun was kept" if he did not want to see his grandparents lose their apartment and be arrested.  *Id.*  Because Defendant was unable to get away from the police officers, and because he was told that his grandparents could lose their home and be arrested, Defendant accompanied the police upstairs.  *Id.* ¶ 6.  Once upstairs, Defendant "did as the NYPD directed."  *Id.*

Defendant was taken to the precinct.  *Id.* ¶ 8.  There, Defendant was read his *Miranda* rights for the first time.  *Id.*  But by then, Defendant "had already told the NYPD everything."  *Id.*

### B.  Julio Aponte's Affidavit

Also in support of the suppression motion, Defendant submitted an affidavit of his grandfather, Julio Aponte.  ECF No. 21, Ex. B ("Aponte Aff.").  In his affidavit, Mr. Aponte states that he and his wife have lived at 2411 Valentine Avenue for forty-five years.  *Id.* ¶ 2.  Mr. Aponte and his wife "are old and need help."  *Id.*  So Defendant spends the night at his grandparents' apartment to take care of them.  *Id.*

Mr. Aponte states that he was at home alone in the morning of June 25, 2017. *Id.* He heard a knock on the door and opened it. *Id.* ¶ 3. Police officers were on the other side of the door. *Id.* They had not announced that they were the police. *Id.* One of the officers "said something about [Mr. Aponte's] grandson Benjamin." *Id.* ¶ 4.

According to Mr. Aponte, one of the police officers "kinda pushed his way in" to Mr. Aponte's apartment. *Id.* ¶ 5. The officer asked Mr. Aponte "to sign a piece of paper," but Mr. Aponte refused. *Id.* By that point, Mr. Aponte saw "a lot of officers [ ] making their way into the apartment." *Id.* ¶ 6. One of the officers "kept saying" that Mr. Aponte could lose his home if he did not allow them to "look around." *Id.* An officer handed Mr. Aponte "a paper" and "kept saying" that Mr. Aponte could lose his apartment if he did not sign. *Id.* ¶ 7. Mr. Aponte, however, was "irritated." *Id.* He explained that his rent was current so he was not willing to sign the form. *Id.*

By then, police officers were "fully" inside Mr. Aponte's apartment. *Id.* ¶ 8. They searched the apartment. *Id.* After they began the search, the officer who had told Mr. Aponte he could lose his apartment if he did not sign the form "came back up to" Mr. Aponte and repeated the threat. *Id.* Mr. Aponte eventually signed the form. *Id.* ¶ 9. He explains that he did so because he has lived in that apartment with his wife for forty-five years, was scared, and is "too old and too sick to be without a home." *Id.* ¶¶ 9-10. Mr. Aponte did not read the form before signing it. *Id.* ¶ 10.

## C. Evidence at Suppression Hearing

The Court held an evidentiary hearing in connection with Defendant's suppression motion on June 11, 2018 and June 14, 2018. *See* Transcript of Suppression Hearing (ECF Nos. 65, 67) ("Tr."). The Government called as its witnesses NYPD Sergeant Bryan Pocalyko, NYPD Officer Juan Gomez, and NYPD Officer Brandon Gembecki, all of whom were assigned to the 52nd Precinct on the date of Defendant's arrest. Tr. at 32, 65, 140. The Government also called United

States Attorney's Office Special Agent Antoinette Guzman. *Id.* at 200. The defense called several

witnesses as well, including Defendant's cousin, Ivelisse Ortiz, his grandmother, Ida Aponte, and his

aunt, Maria Martinez. *Id.* at 236, 356, 378. Defendant and his grandfather, Mr. Aponte, did not

testify at the hearing. Documents, photographs of the apartment and the apartment building, and a

video of Defendant's second statement to the police were also admitted as evidence at the hearing,

as were the gun and ammunition recovered from the apartment.

### 1. Police Officers' Testimony

The NYPD officers testified to the following. On July 25, 2017, Sergeant Pocalyko and

Officers Gomez and Gembecki were assigned to the 52nd Precinct's field intelligence unit. *Id.* at 32,

65, 140. Field intelligence officers "[g]ather intel for the 52 precinct" and investigate "[r]obbery

patterns, burglaries, home invasions," as well as "possession of firearms, people who sell narcotics, .

. . shootings, and gang members." *Id.* at 32, 65. On July 25, 2017, the officers debriefed an

individual who was in custody after being arrested. *Id.* at 32-33, 66, 142. During the debriefing, the

arrestee informed the officers of another individual named Benji who kept a firearm at his

grandfather's apartment on Valentine Avenue south of Fordham Road. *Id.* at 33, 66, 142. The

officers checked the NYPD's database and found that Defendant lived at the location, 2411

Valentine Street in the Bronx. *Id.* at 34, 48, 66-67. The officers also learned that Defendant was on

probation. *Id.* at 91. The officers then showed a picture of Defendant to the arrestee, who

confirmed that Defendant was the man in possession of the firearm. *Id.* at 34, 67, 142. The arrestee

also confirmed the location where the gun was stored by pointing out the apartment building on

Google maps. *Id.* at 34, 67.

After confirming Defendant's identity and location, the officers met with Sergeant Pocalyko.

*Id.* at 48, 90, 167. While Officer Gomez could not remember the details discussed during that

meeting, he acknowledged that the officers did not seek or obtain a search warrant for Defendant's

apartment. *Id.* at 49. After the meeting, Officer Gomez, Officer Gembecki, Officer Medina, Sergeant Pocalyko and anywhere from two to six other officers, dressed in plainclothes, traveled in unmarked cars to the apartment. *Id.* at 35-36, 51, 68, 143. Although 2411 Valentine is located within the confines of the 46th Precinct, only officers from the 52nd Precinct went to investigate the firearm lead. *Id.* at 35, 169. The officers testified that they arrived at the apartment building at different times, but they all testified that it was at night. *See id.* at 36, 68, 143. According to Officer Gembecki, the officers intended to visit the apartment and "attempt to make contact" with Defendant. *Id.* at 90.

Upon their arrival, the officers saw Defendant in front of the apartment building, as well as a group of people on or near the stoop in front of the building. *Id.* at 51, 68, 91-92, 145. Sergeant Pocalyko testified that he approached Defendant and informed him that the officers had received information about a firearm inside Defendant's home. *Id.* at 145. According to Sergeant Pocalyko, Defendant was standing "in the corner of [the] staircase" "that leads up to the apartment." *Id.* Sergeant Pocalyko testified that he and Officer Medina stood on Defendant's right and left side, respectively, while Defendant stood in that corner. *Id.* Sergeant Pocalyko and Officer Medina had their bodies "bladed," which Sergeant Pocalyko explained was "turn[ing] your body slightly in the direction of where your firearm is." *Id.* Two other officers stood "off to the side in case we need security on the street." *Id.* at 144. Sergeant Pocalyko testified that, because this was a firearm investigation, he "most likely" frisked Defendant. *Id.* at 162. Sergeant Pocalyko explained that there was "very little conversation on [Defendant's] part." *Id.* At no point did Defendant ask Sergeant Pocalyko to leave. *Id.*

While Sergeant Pocalyko approached Defendant and engaged him in conversation, Officers Gomez and Gembecki went upstairs to the fourth floor, where Defendant's apartment was located. *Id.* at 34, 36, 52, 68, 144. Officer Gomez testified that he had no conversation with Defendant. *Id.*

at 51. A total of four to six officers went upstairs, all of whom had their shields visible. *Id.* at 36-37, 69. None of the officers had a gun drawn. *Id.* at 37, 69.

Upon arriving at Defendant's apartment, one of the officers knocked on the door. *Id.* at 37, 55. Officer Gomez testified that the officer who knocked also announced that it was the police who were at the door. *Id.* at 55. Officer Gembecki, on the other hand, testified only that an officer knocked on the door. *Id.* at 69. An "older gentleman," who officers learned was Mr. Aponte, answered the door. *Id.* at 37, 69. What happened next was described differently in each officer's testimony.

Officer Gomez testified that, standing on the landing and without entering the apartment, the officers explained to Mr. Aponte in English that they were there because they believed that his grandson was in possession of a gun. *Id.* at 38. According to Officer Gomez, Mr. Aponte responded that his grandson "ha[d] been staying out of trouble" and had been "doing pretty well." *Id.* Mr. Aponte explained that a parole or probation officer had been visiting the apartment and that Mr. Aponte "ha[d] nothing to hide." *Id.* Mr. Aponte added that, if the officers were to find anything in his home, it would be his hunting gear, but that he kept his hunting gear on Long Island. *Id.* He told the officers that they were "more than welcome to come in and check the apartment" and waived them inside. *Id.* Officer Gomez's impression of Mr. Aponte was that "his demeanor was normal"; he was "not at all" nervous. *Id.* at 59. This initial conversation with the officers lasted from five to ten minutes. *Id.* at 57.

Officer Gomez testified that he then "pulled out a consent to search" form and began speaking with Mr. Aponte in Spanish. *Id.* at 39. Officer Gomez explained to Mr. Aponte that, although Mr. Aponte had provided verbal consent to enter, they needed "to put it on a form." *Id.* Mr. Aponte responded that it was "no problem" but that he needed to get his glasses. *Id.* at 40. When asked at the suppression hearing whether Officer Gomez told Mr. Aponte that he could lose

his apartment if he did not sign the consent form, Officer Gomez responded, "I would never say that." *Id.* at 60.

According to Officer Gomez, Mr. Aponte then went back inside his apartment and went left down a hallway into the living room to retrieve his glasses, while Officer Gomez waited "like three steps into the apartment." *Id.* at 40. The other officers waited at the doorjamb. *Id.* at 58. When Mr. Aponte returned with his glasses, he asked Officer Gomez what the form entailed. *Id.* at 61. Officer Gomez read the consent-to-search form to him in English, then handed the form to Mr. Aponte. *Id.* at 41. Officer Gomez explained the consent form to Mr. Aponte. *Id.* Officer Gomez also told Mr. Aponte that he could withdraw his consent "anytime." *Id.* at 43. Mr. Aponte read the form and began to fill it out. *Id.* at 41. According to Officer Gomez, Mr. Aponte only filled in his date of birth, then asked Mr. Gomez to complete the rest of the form for him. *Id.* Mr. Gomez did so, and Mr. Aponte then signed, dated, and time-stamped it in front of Officer Gomez. *Id.* at 41, 44, 64. After the consent form was signed, the officers entered the apartment and went to the living room. *Id.* at 44. According to Officer Gomez, Mr. Aponte appeared "normal." *Id.* at 47. Mr. Aponte "understood everything," and he and Officer Gomez "never had like a confusion kind of moment." *Id.* Rather, Mr. Aponte was very conversational and did not get agitated at all during his conversation with Officer Gomez. *Id.*

Officer Gembecki's version of the events leading up to the signing of the consent form varied. According to Officer Gembecki, after Mr. Aponte opened the door to the police officers, Officer Gembecki explained that they were there to speak with Mr. Aponte about his grandson. *Id.* at 70. Officer Gembecki asked if they could go inside "so the neighbors didn't have to hear his business." *Id.* Mr. Aponte invited them in and opened the door "wider" to allow them to enter. *Id.* Mr. Aponte's tone of voice was "[n]ormal conversation. Nothing combative, just normal conversation." *Id.* Unlike Officer Gomez, who testified that all of the officers waited at the door

while Mr. Aponte retrieved his glasses, Officer Gembecki testified that the officers immediately entered the apartment and followed Mr. Aponte to the left-hand side to the living room. *Id.* at 70-71.

Officer Gembecki testified that once the officers were inside the living room, Officer Gomez took the lead in conversing with Mr. Aponte, in Spanish. *Id.* Officer Gembecki does not speak Spanish. *Id.* Nonetheless, he described the tone of Officer Gomez's conversation with Mr. Aponte as "a regular conversation," "[n]othing that would be out of the ordinary." *Id.* at 71-72. At that point, officers had not yet begun their search. *Id.* at 72. Officer Gembecki later observed Mr. Aponte sign the consent form. *Id.* at 73.

Both officers testified that it was only after the consent form was signed that the officers began searching the living room. *Id.* at 44-45, 72-73. The living room contained various pieces of furniture, including a television stand, "recliner or rocking chair," a coffee table, and a sofa. *Id.* at 44, 71. Both officers testified that the living room walls had deer heads hanging on them. *Id.* at 44, 71. Officer Gomez testified that there was a picture frame hanging above the sofa, behind which the arrestee had told police officers they could find the gun. *Id.* at 45, 48. Officer Gomez did not find a gun, but the back of the picture frame had duct tape, "like [the gun] was probably there before." *Id.* at 45. Officer Gembecki, on the other hand, testified that it was a mirror that was on the wall. *Id.* at 71. According to Officer Gembecki, he checked behind the mirror and saw tape. *Id.* at 75.

Both officers testified that while the search was conducted, Mr. Aponte was in the living room talking to the officers about his deer heads and his hunting. *Id.* at 45, 47, 75, 86. Officer Gembecki testified that Mr. Aponte seemed to be proud of his hunting trophies. *Id.* at 86.

At some point, Officer Gembecki observed ammunition that was on top of the TV stand. *Id.* at 73. He was standing about five feet from the TV stand when he made this observation. *Id.*

Officer Gembecki could not recall whether he observed the bullets before or after Mr. Aponte signed the consent-to-search form. *Id.* at 74. During Officer Gomez's search of the living room, he found additional ammunition hidden in a flower pot. *Id.* at 46. He informed Officer Gembecki of the ammunition, who then recovered it from the pot. *Id.* at 47, 75. Officer Gembecki testified that the entire search took about ten to twenty minutes. *Id.* at 75. Sergeant Pocalyko, on the other hand, testified that only five to ten minutes had passed. *Id.* at 163.

After recovering the ammunition, Officer Gembecki informed Sergeant Pocalyko of what they found. According to Officer Gembecki, he either "went downstairs" to notify Sergeant Pocalyko or simply "called down." *Id.* at 76-77, 112. According to Sergeant Pocalyko, Officer Gembecki called him on the phone to inform him of the ammunition. *Id.* at 163. Regardless of how Officer Gembecki notified Sergeant Pocalyko, Officer Gembecki eventually went downstairs. *Id.* at 112. There, Officer Gembecki observed Defendant on the sidewalk speaking with Sergeant Pocalyko. *Id.* at 77. Defendant was unrestrained; the four to five police officers with him were not touching him; and none of the officers had a weapon drawn. *Id.* at 77, 112. Though several officers were downstairs, Officer Gembecki recalled only Sergeant Pocalyko as being "in the immediate vicinity" of Defendant. *Id.* at 113. At that point, Officer Gembecki testified, he "would not have allowed [Defendant] to leave." *Id.* at 114.

Sergeant Pocalyko testified that he then told Defendant about the recovered ammunition. *Id.* at 163. Defendant responded with a shoulder shrug. *Id.* Either Sergeant Pocalyko or Officer Gembecki asked Defendant to go upstairs with them. *Id.* at 114, 163. Defendant agreed, and he went with the officers up to the fourth floor. *Id.* at 77, 163. When asked on cross-examination if he had told Defendant that Defendant's grandfather would be arrested if Defendant did not "go upstairs" with the officers, Sergeant Pocalyko responded, "No. No, sir." *Id.* at 180-81. Sergeant

Pocalyko testified that he did not remember making any physical contact with Defendant as they went up to the apartment. *Id.* at 163-64.

Once the officers and Defendant were back at the apartment, they entered the hallway and went to the right. *Id.* at 78, 164. Once inside, Officers Gomez and Gembecki and Sergeant Pocalyko stood in the hallway with Defendant. *Id.* at 78, 164. Officer Medina may also have been in the hallway with Defendant and the other officers. *Id.* at 164-65. The hallway was "very tight." *Id.* at 78. Officer Gembecki testified that he spoke with Defendant in the hallway, explaining that "typically when we find ammunition, there is usually a firearm that is attached to that" and "that if we found a firearm, there would typically be bullets." *Id.* at 78. Officer Gembecki then told Defendant that the officers had reason to believe Defendant was in possession of a firearm. *Id.* Sergeant Pocalyko testified that "[t]here was some conversation of asking Mr. Tirado where the firearm was." *Id.* at 165. At some point during that conversation, Defendant asked Officer Gembecki if he could retrieve the firearm. *Id.* at 79. Officer Gembecki said no, for safety reasons. *Id.* Defendant then told Officer Gembecki "OK, it's down the hallway." *Id.*

Officers proceeded down the hallway and into another room. *Id.* Officer Gembecki testified that Defendant asked again if he could retrieve the gun. *Id.* Officers, again, responded "no." *Id.* Defendant then told them that the gun was behind the refrigerator in that room. *Id.* Officer Gembecki looked behind the fridge and retrieved a black bag. *Id.* Looking inside the bag, Officer Gembecki confirmed it contained a gun. *Id.* at 79-80. Defendant was then placed under arrest. *Id.* at 81.

Officer Gembecki testified that the officers asked Defendant no more questions as they took him to the 52nd Precinct. *Id.* at 82. At the precinct, officers filled out arrest paperwork. *Id.* They then took Defendant to the 46th Precinct, the precinct in which Defendant's apartment was located, so that Defendant could be interviewed by the detective squad. *Id.* at 35, 82. They waited for

approximately an hour after arriving at the 46th Precinct before Defendant was interviewed. *Id.* at 82. At the time of Defendant's interview, about two and one-half to three hours had passed since Defendant's arrest. *Id.* Officer Gembecki was present for the interview at the 46th Precinct. *Id.* Before detectives questioned Defendant, they read him *Miranda* warnings. *Id.* at 83.

### 2. Special Agent Antoinette Guzman's Testimony

Special Agent Antoinette Guzman testified for the Government as follows. Special Agent Guzman explained that she is employed by the United States Attorney's Office for the Southern District of New York. *Id.* at 200-01. She has been in that position for five years. *Id.* at 201. In her role as a special agent, she investigates federal criminal law violations by interviewing witnesses and analyzing evidence, among other things. *Id.*

Special Agent Guzman testified that on September 5, 2017, she visited Mr. Aponte's apartment with NYPD detectives Jama Joseph and Eddie Barbot. *Id.* Detective Barbot began to speak with Mr. Aponte in Spanish, but Mr. Aponte "became a little upset" and "said he very much would like us to speak in English." *Id.* at 202. Mr. Aponte let Special Agent Guzman and the officers inside his apartment so that they could speak about the events of July 25. *Id.* They went into the living room to talk. *Id.*

Special Agent Guzman testified that Mr. Aponte explained that officers had arrived at his apartment and asked if they could come in to talk to him about a gun that could have been in his home. *Id.* at 203. According to Special Agent Guzman, Mr. Aponte told her that he allowed the officers into his living room. *Id.* He explained that the officers asked him whether he possessed any firearms. *Id.* Mr. Aponte told Special Agent Guzman that he had told the officers that he hunted and had firearms, but that he kept his firearms in Nassau County, not in that apartment. *Id.* Mr. Aponte further explained that officers found ammunition on top of the armoire in the living room, and then asked if they could look around. *Id.* at 204. Mr. Aponte told Special Agent Guzman that

he had agreed to allow the officers "to take a look around," and the officers then began to search. *Id.*

Special Agent Guzman testified that Mr. Aponte next told her that the officers found ammunition and a gun in the apartment. *Id.* At one point, Mr. Aponte explained, he "had to yell at the officers" because "he felt like they were being too—too rough" and he did not want them to damage his deer heads. *Id.* Specifically, Mr. Aponte told the officers that the heads "are very expensive; and that they were priceless to him; and that [the officers] would get into trouble if they damaged them, and they would have to pay for any damages." *Id.* Special Agent Guzman testified that Mr. Aponte also told her that "he had to sign a piece of paper while the officers were there." *Id.* at 205. He explained that the officers "asked him to sign it; and that it was in relation to the search, but that was all that he could say about it." *Id.*

When asked if she was able to determine at what point Mr. Aponte signed the consent form, Special Agent Guzman testified that she was unable to "narrow down a timeline." *Id.* This was because Mr. Aponte discussed "various tangents" whenever she tried to establish a timeline. *Id.* Despite these tangents, Special Agent Guzman testified that Mr. Aponte "understood and answered my questions." *Id.* at 205-06. She explained on redirect that although Mr. Aponte went off on tangents, "he did not wander." *Id.* at 227.

According to Special Agent Guzman, Mr. Aponte's ability to speak English "was very good actually." *Id.* at 206. Special Agent Guzman "got the impression that he was insulted by the fact that we had assumed that he would prefer . . . Spanish instead of English." *Id.* Special Agent Guzman also testified that at no point during her interview did Mr. Aponte say anything about having been threatened by the officers. *Id.* Nor did he say that he had told the officers they could not enter his apartment, or mention anything about any use of force by the officers at the door of his apartment. *Id.* at 206-07.

On cross-examination, Special Agent Guzman acknowledged that before going to interview Mr. Aponte, she had not read the state court complaint or reviewed the signed consent form, and she could not recall what documents she had reviewed. *Id.* at 209, 222-23. She also conceded that neither she, nor the NYPD officers with her, took notes during the interview. *Id.* at 214, 235-36. Special Agent Guzman further testified on cross that Mr. Aponte could not tell her how many officers had arrived at his home. *Id.* at 219. When asked on cross whether she had asked Mr. Aponte, or anyone else, about his memory or mental health, Special Agent Guzman responded that she had not. *Id.* at 221, 227-28. Special Agent Guzman also testified that she did not ask Mr. Aponte whether he signed the consent form voluntarily. *Id.* at 223-24.

### 3. Video Evidence

The Government introduced a video of Defendant's post-arrest statement given at the precinct. Government Exhibit ("GX") 108. According to the date and time stamp on that video, the detectives began interviewing Defendant on July 26, 2017 at approximately 12:33 a.m. The interview lasted for approximately twenty-five minutes. *See id.* Three officers were in the interrogation room with Defendant, but one detective took the lead in interviewing Defendant. *See id.*

Before speaking with Defendant about anything of substance, the interviewing detective read Defendant the *Miranda* warnings. *Id.* at 00:34:11-00:34:45. The detective then asked Defendant if he was willing to answer any questions, to which Defendant responded in the affirmative. *Id.* at 00:34:46-00:34:57. The detective began by asking Defendant "what's going on?" *Id.* at 00:34:58. He then proceeded to ask questions about where Defendant was standing when the police arrived at the apartment building and whether he lived in the apartment. *Id.* at 00:35:06-00:35:32. Defendant responded that he does live in the apartment and was outside at the time the police arrived. *Id.* The

detective repeatedly told Defendant to relax, and commented that he had heard that Defendant had been very "cool" and compliant with the officers. *Id.* at 00:35:06-00:35:43.

The detective then asked Defendant about the bullets that were recovered from the apartment, where they were inside the apartment, the location of the gun, and the type of gun. *Id.* at 00:35:44-00:37:22. Defendant explained that the officers had found bullets in a plant and that he kept the firearm behind a freezer, at the other end of the apartment. *Id.* Responding to a question about how he got the firearm, Defendant explained that he found it in a book bag about a week-and-a-half prior to his arrest. *Id.* at 00:38:02-00:38:22. Defendant explained that he did not turn the gun in because he was afraid that he would "get in trouble for it." *Id.* at 00:38:23-00:38:44. Instead, Defendant explained that he took the gun "upstairs," but never shot it or showed it to anyone. *Id.* at 00:39:07-00:39:21, 00:41:11-00:41:34. According to Defendant, not even his grandparents were aware that he had the gun. *Id.* at 00:39:34-00:39:36.

Less than ten minutes into the interview, the interviewing detective offered Defendant water and a cigarette. *Id.* at 00:40:41-00:40:44. Defendant accepted a cigarette. *Id.* at 00:40:44. The detective then asked Defendant questions about his prior arrests and his parole status. *Id.* at 00:42:33-00:44:47. Defendant explained that he had previously been arrested for gun possession. *See id.* The detective asked Defendant if he would consent to providing a DNA sample, and after asking a few questions, Defendant agreed and provided the sample. *Id.* at 00:44:48-00:53:33. During that time, Defendant joked with the detective about how the DNA swab was similar to a pregnancy test. *See id.* While waiting for another detective to bring in the DNA sample kit, Defendant also engaged the detective in a conversation about the detective's vape pen. *Id.* at 00:46:00-00:47:15.

Toward the end of the interview, the detective asked Defendant questions about his grandmother's whereabouts on July 25, 2017, Defendant's employment, and asked about any other shootings, stabbings, or murders. *Id.* at 00:54:00-58:40.

### 4. Ivelisse Ortiz's Testimony

Ivelisse Ortiz testified at the suppression hearing for the defense. Tr. at 237. She explained that although not related to Defendant by blood, Defendant's grandmother is Ms. Ortiz's godmother. *Id.* She calls Defendant her "cousin." *Id.* at 243. Ms. Ortiz grew up in her grandmother's apartment across the landing from Mr. Aponte's apartment. *Id.* at 237-38. Although she now resides elsewhere, Ms. Ortiz is at her grandmother's apartment "almost every day." *Id.* at 238.

On direct examination, Ms. Ortiz acknowledged that she was convicted of assault in 2016 and is currently on probation. *Id.* at 239. She testified that she has not violated the terms of her probation. *Id.*

Regarding the events of July 25, 2017, Ms. Ortiz testified that she and a group of friends were outside on the stoop leading up to the apartment building. *Id.* at 242-43. There were others standing in front of the building. *Id.* at 244. It was around eight or nine o'clock at night. *Id.* at 242. Defendant was outside with them as well, only he was off to the side of the stoop playing with Mr. Ortiz's son and other neighborhood kids. *Id.* at 243.

Ms. Ortiz explained that she, her boyfriend, and Defendant were about to leave to get something to eat when "the detectives rolled up" in three or four unmarked cars. *Id.* at 244-45. The officers double-parked their cars in front of the apartment building. *Id.* at 245. At least six to eight officers got out of the cars. *Id.* The officers began asking those in front of the building if they lived there. *Id.* at 247. The officers told those who did not live there to move. *Id.* Ms. Ortiz showed them her ID and told them she lived there. *Id.* at 246. She "wasn't moving from the stoop." *Id.* at

247. Rather, she began asking the officers why there were there. *Id.* at 248-49. One of the officers told her that they "got a call of gunshots." *Id.* at 250.

Meanwhile, according to Ms. Ortiz, four or five officers "surrounded" Defendant and moved him into the corner formed by the stoop and the exterior wall of the building. *Id.* at 247-48. One of the officers was speaking to Defendant in a "low" voice, "so no one else could here [sic]." *Id.* at 249. Ms. Ortiz heard the officer "mention something about parole" and "you're past curfew" to Defendant. *Id.* at 250. However, she could not hear much beyond that. *Id.* Ms. Ortiz acknowledged that she "was probably talking more than [the officers] were" and "couldn't really" hear what the officers were saying to Defendant. *Id.*

About four of the officers entered the apartment building. *Id.* at 252, 255. Ms. Ortiz testified that she followed them up to the fourth floor. *Id.* at 252. She observed the officers knock on Mr. Aponte's door and Mr. Aponte open it. *Id.* According to Ms. Ortiz, Mr. Aponte asked the officers "what was going on." *Id.* Ms. Ortiz yelled repeatedly to Mr. Aponte to not let the officers in. *Id.* at 252-53, 255. When she asked the officers if they had a search warrant, they "mentioned they did have a search warrant" but refused to show it to her. *Id.* at 253. Ms. Ortiz also heard the officers mention something about parole. *Id.* Ms. Ortiz testified that she also heard the officers tell Mr. Aponte that he would lose the apartment if he did not let them in. *Id.* at 255-56. She attempted to push past the officers to get into the apartment because Mr. Aponte was "scared and confused." *Id.* at 253. One of the officers rudely told Ms. Ortiz to go downstairs and inside her apartment. *Id.* at 253-54. She refused to leave. *Id.* at 254. The officers then "bum-rushed" Mr. Aponte by walking into his apartment against his will and closed the door behind them. *Id.*

Ms. Ortiz testified that, at that point, she ran downstairs to where Defendant was. *Id.* at 256. She saw Defendant still "surrounded by the cops." *Id.* at 258. Ms. Ortiz yelled at the officers and then ran back up to Mr. Aponte's apartment with two other women from the neighborhood—

Madeline and May-May. *Id.* at 258-59. They knocked on Mr. Aponte's door, and one of the officers

opened it. *Id.* at 259. Ms. Ortiz testified that she went into the apartment and into the living room,

where Mr. Aponte and the officers were. *Id.* at 260. She asked Mr. Aponte "if he was OK, if they

touched him or anything like that." *Id.* He responded that he was fine. *Id.*

Ms. Ortiz testified that she then left Mr. Aponte in the apartment and went back downstairs

with Madeline and May-May. *Id.* at 263. At that point, the officers who were outside with

Defendant entered the building with him and went up to the fourth floor. *Id.* at 264. Ms. Ortiz

testified that Defendant was not handcuffed but one of the officers was holding Defendant by his

elbow as they went upstairs. *Id.* She testified that she followed the officers up the stairs. *Id.* at 265.

According to Ms. Ortiz, when they arrived at the apartment, the officers went inside with Defendant

and closed the door behind them again, leaving Ms. Ortiz outside. *Id.* About twenty minutes later,

Ms. Ortiz saw the officers come out of the apartment with Defendant in handcuffs. *Id.* at 265-66.

On cross-examination, Ms. Ortiz's testimony changed in certain respects. She testified that

in addition to hearing Mr. Aponte ask the officers, "What's going on?" before they entered his

apartment, she also heard Mr. Aponte tell the officers something similar to "You guys can't come

in." *Id.* at 330. Ms. Ortiz also testified on cross that the second time that she went back up to the

apartment was not with the other two women; instead, she went up by herself "and that's when the

door was opening and that's when I was able to get into the apartment." *Id.* at 334-35. She clarified

that, in all, she "went up like four or five times." *Id.* at 335. Also on cross, Ms. Ortiz conceded that

she could not recall whether an officer held Defendant by the elbow, or made any other physical

contact with Defendant, as they escorted him upstairs. *Id.* at 338.

When asked about her prior assault conviction in cross-examination, Ms. Ortiz testified that

she had "beat the top three" charges and had pleaded guilty only to "three minor charges." *Id.* at

344. Ms. Ortiz explained that she pleaded guilty to those charges after a mistrial. *Id.* at 346. During

the trial, one of Ms. Ortiz's friends testified that Ms. Ortiz was not involved in the assault. *Id.* After that testimony, the jury hung, and Ms. Ortiz pleaded guilty before a retrial. *Id.* Ms. Ortiz also testified on cross that there were several others involved in the assault and that she had taken one "for the team." *Id.*

### 5. Additional Defense Witnesses

The defense also elicited the testimony of Defendant's Aunt, Maria Martinez, and Defendant's grandmother, Ida Aponte. Mrs. Aponte testified that she was home in September 2017 when officers came to her apartment. *Id.* at 361-62. At least one of them was a woman. *Id.* at 362. Mrs. Aponte explained that the officers had not entered the apartment. *Id.* The officers asked Mrs. Aponte about what had happened when the other officers had visited their home. *Id.* Mrs. Aponte testified that she told them what her "husband was saying": "that [the officers] said if you don't sign these papers, you and your wife will lose this apartment." *Id.* at 362-63. Mrs. Aponte also testified that she told the interviewing officers that the other officers "had no right to [remove Mr. Aponte from their home] because his name is not on the lease." *Id.* at 363.

On cross-examination, Mrs. Aponte testified that Defendant lived with her. *Id.* at 364. Mrs. Aponte also testified that she was not at home when the police arrived on July 25, 2017. *Id.* at 368-69. She was at a friend's house and only arrived after Defendant had been placed under arrest. *Id.* at 369. Mrs. Aponte testified that there were six to eight officers at her apartment when she arrived. *Id.* She also testified that her husband had told her that the officers told him that the Apontes would lose the apartment if he did not sign the consent form. *Id.* at 370. According to Mrs. Aponte, her husband "got scared" and did not want to lose the apartment, so he signed the form. *Id.*

Also during her cross-examination, the defense stipulated to the admission of various email and text messages between Mrs. Aponte and Defendant. *Id.* at 366-67; GX 300-04. Mrs. Aponte

testified that the messages were sent between her and Defendant. Tr. at 367-68, 372-75. In those messages, Mrs. Aponte advised Defendant that his attorney was going to be visiting the Aponte residence on February 16, 2018. *See* GX 301. Defendant responded by asking "did u tell papa wa [sic] he needed to say to her?" GX 302. Mrs. Aponte answered, "Yes Ben I told papa that when [ ] when the cop's come to tell them what happen what they told him that if he didn't signed the papers [ ] you and your wife will lose your apt." GX 303. Defendant then instructed his grandmother to "make sure that he tells them they took whole advantage of him as well, remeber [sic] her he cant [sic] hardly see as well and they didn't have no type of warrent [sic]." *Id.*

On redirect, Mrs. Aponte testified that Defendant's text messages "didn't tell me what to say. I already knew, because my husband told me." Tr. at 376. She clarified that her husband had told her that when the officers came to the apartment, they told him "if I don't sign it, we will lose our apartment." *Id.* at 377. Mrs. Aponte also testified that Defendant was aware of that threat because she told Defendant. *Id.* When asked if her husband has memory problems, Mrs. Aponte responded, "[s]ometimes, yes, he does forget" and "[h]e forgets a lot of things." *Id.*

Ms. Martinez, Defendant's aunt, also testified for the defense. She testified that on July 25, 2017, she saw ten or twelve police officers at the 2411 Valentine building. *Id.* at 380. Ms. Martinez testified that when she first saw Defendant, he was playing outside of the building with kids. *Id.* She then saw officers speak with Defendant, but could not hear what they said. *Id.* Ms. Martinez testified that the officer speaking with Defendant had papers in his hand. *Id.* at 381. Four other officers were standing next to that officer. *Id.* at 382-83. Defendant's back was to the building, and the officers were facing the building. *Id.* at 383.

## II. DISCUSSION

Defendant argues that both of his statements to the police and the physical evidence recovered from Mr. Aponte's apartment should be suppressed.

### A. Warrantless Search

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. That is, "[t]he Fourth Amendment protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004). "A warrantless search of a home is presumptively unreasonable." *United States v. Miller*, 430 F.3d 93, 97 (2d Cir. 2005). Such a search is "subject only to a few specifically established and well-delineated exceptions." *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).

One well-settled exception to the warrant requirement is "a search that is conducted pursuant to consent." *United States v. Gomez*, 877 F.3d 76, 98 (2d Cir. 2017) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). To be valid, consent must be given by the individual whose property is searched, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990), or by "a person authorized to grant such consent," *United States v. Hernandez*, 85 F.3d 1023, 1028 (2d Cir. 1996) (citation omitted). Consent "need not be expressed in a particular form, but 'can be found from an individual's words, acts or conduct.'" *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (quoting *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)). Consent must be voluntary, that is, "a product of [the] individual's free and unconstrained choice rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted). When a defendant contests the validity of a consented search, "the government has the burden of proving, by a preponderance of the evidence, that the consent to search was voluntary." *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) (quoting *United States v. Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004)).

"To ascertain whether consent is valid, courts examine the 'totality of all the circumstances.'" *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (quoting *Wilson*, 11 F.3d at 351). That

examination is based on an objective inquiry: "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]." *Id.* at 423 (alterations in original) (quoting *Florida v. Jimeno*, 500 U.S. 248, 249 (1991)). "In applying this test, it is appropriate to consider the 'particularities of the situation that is presented in any given case' and the 'possibly vulnerable subjective state of the person who consents.'" *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (quoting *Schneckloth*, 412 U.S. at 227, 229). "[K]nowledge of the right to refuse consent is not a requirement to a finding of voluntariness, although it may be a factor in ascertaining whether the consent was coerced." *Garcia*, 56 F.3d at 422-23 (citations omitted). Other relevant factors include whether there was a show of force by officers, whether officers informed the consenting individual that a search warrant would be obtained, whether the consenting individual was in custody and in handcuffs, and whether the consenting individual had previously refused to consent. *See id.* at 423; *United States v. Paracha*, 313 F. App'x 347, 350 (2d Cir. 2008); *United States v. Murphy*, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998); *see also United States v. Drayton*, 536 U.S. 194, 204 (2002) (holding that consent was voluntary where there "was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, [and no] authoritative tone of voice"); *Isiofia*, 370 F.3d at 232-34 (finding that consent was not voluntary where the defendant was handcuffed to a table in his home for over thirty minutes, while "numerous law enforcement agents . . . extracted detailed personal and financial information from him," demanded his consent, yelled and used abusive language, and threatened him with jail and deportation).

Here, as a threshold matter, Defendant has standing to move to suppress the fruits of the search of the apartment. A defendant's Fourth Amendment rights are violated "only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party."

*United States v. Payner*, 447 U.S. 727, 731 (1980) (citation omitted); *see also United States v. Fields*, 113 F.3d 313, 322 (2d Cir. 1997) ("The ultimate focus of Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched."). Defendant's affidavit indicates that he spends the night at his grandparents' apartment. In his video-taped statement to the detectives, however, Defendant told them that he lives in the apartment. No evidence was presented to the contrary. Moreover, the physical evidence was recovered from the living room and a room that appears to be a kitchen area. These rooms are typically common areas shared by residents of an apartment, and no evidence was presented to show that Defendant did not have authorized use of those rooms. In light of these considerations, Defendant had a reasonable expectation of privacy in the home and, thus, standing to challenge the search of the apartment. *Cf. United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002) (noting that "one who shares his home with another does not have a reasonable expectation of privacy in those areas of the home used exclusively by his roommate").[1]

Turning to the merits of the suppression motion, the Court finds that Mr. Aponte signed a written Consent-to-Search form and that he read the form prior to signing it. *See* GX 107. In his affidavit, Mr. Aponte acknowledges that he signed the consent form. *See* Aponte Aff. ¶ 9. The consent form indicates that Mr. Aponte consented to a search of his apartment located at 2411 Valentine Avenue, Apartment 4S, Bronx, NY. GX 107. The form states that Mr. Aponte was advised of his right to refuse to consent before a search was conducted. *Id.* The form also confirms Mr. Aponte's understanding of his right to revoke consent at any time. *Id.* The form additionally states that consent was given "knowingly, voluntarily and intelligently and without threats or

---

[1] Even if Defendant were not a resident of the apartment and merely stays over on a regular basis, as his affidavit suggests, he would still have standing under the Fourth Amendment. *See United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006) (noting that an overnight guest in another's home "share[s] in his host's legitimate expectation of privacy in the premises" (citing *Minnesota v. Olson*, 495 U.S. 91, 98 (1990))).

promises of any kind." *Id.* The Court credits Officer Gomez's testimony that Mr. Aponte read the consent form before signing it. Officer Gomez explained that Mr. Aponte took the time to fetch his glasses, read the form, asked questions about the form, and that Officer Gomez also read the form to him. The Court finds this testimony credible. Mr. Aponte did not testify. Therefore, the only evidence that Mr. Aponte did not read the consent form before signing it is his statement in his affidavit. Because the Court finds credible Officer Gomez's hearing testimony—which was subject to cross-examination—the Court concludes that Mr. Aponte did in fact read the consent-to-search form prior to signing it. *See United States v. Robles*, 253 F. Supp. 2d 544, 550 n.14 (S.D.N.Y. 2002) ("It is true that courts 'give greater weight to [witness] testimony, which was subject to cross examination, than to [sworn] affidavits.'" (alterations in original) (quoting *United States v. Gardner*, 611 F.2d 770, 774 n.2 (9th Cir. 1980))); *see also United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (crediting the testimony of witnesses over the allegations in an affidavit because the affiant was not subject to cross-examination and the court found the testifying witness fully credible); *but see United States v. You*, 198 F. Supp. 2d 393, 400-01 (S.D.N.Y. 2002) (basing findings of fact largely on defendant's affidavit when agents' testimony was not credible).

In light of the written consent to search Mr. Aponte's apartment, the Court must next determine whether Mr. Aponte's consent was involuntary. To show that Mr. Aponte was coerced into consenting, the defense relies on evidence of alleged threats made to Mr. Aponte that he would lose his home if he did not consent to a search of the apartment. That evidence consists of the testimony of Ms. Ortiz, Mrs. Aponte, and Mr. Aponte's affidavit.

Again, Mr. Aponte did not testify. His affidavit indicates that one of the officers "kept saying" that he "could lose" his apartment if he did not allow the officers to "look around." Aponte Aff. ¶ 6. The Court finds that no such threat was made, largely because the Court does not find Ms. Ortiz's testimony credible on this point. Ms. Ortiz acknowledged that, at the time the threat was

allegedly made, she was screaming at the officers and also yelling at Mr. Aponte. She also testified that she was on the stairs, behind the officers, and that despite her attempts to push past the officers, they had not allowed her to do so. Ms. Ortiz heard only portions of the other statements by the officers, including a mention of parole. When describing the events that unfolded immediately after the officers arrived at the apartment building, Ms. Ortiz explained that she was unable to hear what the officers were telling Defendant in part because she was doing most of the talking. Based on Ms. Ortiz's demeanor during the hearing and the manner in which she responded to questions, there is little doubt in the Court's mind that Ms. Ortiz was in fact screaming emotionally at the officers. Further, in light of Ms. Ortiz's inability to hear the entirety of, or even a large part of, the conversation between the officers and Mr. Aponte, the Court does not credit the accuracy of Ms. Ortiz's testimony regarding the statements that she heard the officers make at Mr. Aponte's door while she was yelling at them.[2] For Ms. Ortiz's testimony to be true, the officers must have loudly threatened Mr. Aponte in front of her, while she was remonstrating with them: the Court does not credit this version of events.

Additionally, Ms. Ortiz's description of Mr. Aponte as scared and confused when officers first arrived at his door is contradicted by Mr. Aponte's affidavit. In his affidavit, Mr. Aponte states that he was "irritated" with the officers. Aponte Aff. ¶ 7. Mr. Aponte avers that he challenged the officers' threat by stating that his rent was current "so I was not going to lose my apartment." *Id.* This widely different characterization of Mr. Aponte's initial response to the officers provides an

_____

[2] The Government has suggested that Ms. Ortiz's testimony should not be given full weight because she "has no respect for the criminal justice system," as evidenced by her testimony that she permitted a witness to testify falsely at her prior trial and her statements that she "beat the top counts" and "took one for the team." Tr. at 403. While the testimony regarding her prior trial may not reflect positively on Ms. Ortiz's character, the Court does not believe that, by itself, it is reason to discredit her testimony here. Rather, the Court assesses the relevant portions of Ms. Ortiz's testimony also in light of the totality of the evidence.

additional basis for the Court's unwillingness to accept Ms. Ortiz's testimony regarding Mr. Aponte's initial interaction with the officers.

With respect to Mrs. Aponte's testimony, she relies entirely on her husband's recounting of the July 25, 2017 events.[3] Although the Court may consider Mr. Aponte's affidavit, that affidavit does not lend as much weight as the testimony of credible witnesses because Mr. Aponte was not subject to cross-examination. *See Robles*, 253 F. Supp. 2d at 550 n.14; *Frank*, 8 F. Supp. 2d at 291 n.2.

The Government has offered the testimony of two of the officers that had direct conversations with Mr. Aponte—Officers Gomez and Gembecki. When asked if he told Mr. Aponte that he could lose his home if he did not comply with the officers' request to search it, Officer Gomez appeared to be offended when he responded that he would never say that. The Court finds Officer Gomez's testimony in that regard to be credible. Additionally, while their testimony regarding the events of July 25, 2017 was not entirely consistent, both Officers Gomez and Gembecki testified that Mr. Aponte was not nervous when speaking with them, but that he was very calm and "normal." Both officers also testified that Mr. Aponte engaged them in conversation about his deer heads and volunteered information about his hunting.

Mr. Aponte's affidavit, on the other hand, is inconsistent with much of the hearing testimony. Mr. Aponte states that the officers arrived at his home in the morning of July 25, 2017. All of the witnesses who testified regarding their time of arrival, however, including witnesses for the defense, explained that the officers arrived at night. Mr. Aponte's affidavit also differs from Officer Gomez's testimony. Mr. Aponte avers that he did not read the consent form before signing it.

---

[3] Independent of her reliance on her husband's statements, Mrs. Aponte's testimony presents additional problems. Her testimony differed from that of Special Agent Guzman. Special Agent Guzman testified that she and the NYPD officers interviewed Mr. Aponte in the living room of his apartment. Mrs. Aponte, on the other hand, testified that the officers never entered the apartment.

Officer Gomez, on the other hand, testified that he read the form to Mr. Aponte, that Mr. Aponte asked questions about the form, and that Mr. Aponte read the form himself before he began to fill it out.

More significantly, Mr. Aponte's affidavit is inconsistent with Special Agent Guzman's description of his statements during her interview. According to Special Agent Guzman, Mr. Aponte made no mention of any threat, but instead told her that he had let the officers into the apartment and had also allowed them to "look around." Tr. at 204. The Court finds Special Agent Guzman's testimony fully credible. Although she acknowledged that she took no notes when interviewing Mr. Aponte, Special Agent Guzman's testimony that Mr. Aponte told her he allowed the officers into his apartment is consistent with the testimony of Officers Gembecki and Gomez. Special Agent Guzman's testimony that she believed Mr. Aponte to have been offended by the use of Spanish is also consistent with Officer Gomez's testimony. Special Agent Guzman was able to recall various details of her conversation with Mr. Aponte. She testified that Mr. Aponte told her he had spoken with the officers about his hunting, that Mr. Aponte explained where the ammunition was found, and that he explained in some detail that he had to yell at officers because they were handling his things too roughly. This testimony suggests that Special Agent Guzman's failure to take notes did not impair her recollection of the interview. This testimony also suggests that, despite Mr. Aponte's tangential answers to Special Agent Guzman's questions, he did in fact recall the events of July 25, 2017.

Mr. Aponte was interviewed by Special Agent Guzman six weeks after the search of his apartment. Based on the information that Mr. Aponte was able to convey to Special Agent Guzman and the temporal proximity of the interview to the events, it is plausible to expect that he would also have explained that he signed the consent form only because he was threatened with losing his apartment. Yet, no mention of any threat was made to Special Agent Guzman. In light of all of

these considerations, the Court concludes that no credible evidence exists to support a finding that the officers told Mr. Aponte he would lose his apartment if he did not consent to the search.[4] [5]

There is no other evidence that the officers coerced Mr. Aponte into consenting to the search. Officers Gembecki and Gomez testified, consistently with each other, that Mr. Aponte voiced no concern with allowing the officers to enter his apartment. To the contrary, the officers testified that Mr. Aponte waived them in, and Officer Gomez explained that Mr. Aponte told them he had nothing to hide. The Court credits their testimony. None of the officers had their guns drawn at any point, and there is no evidence that Mr. Aponte was restrained in any way. Nor is there evidence that the officers used force. Although Ms. Ortiz testified that the officers "bum-rushed" Mr. Aponte, she explained that she meant that they just walked into the apartment. Officer Gomez testified that Mr. Aponte asked questions about the consent form and that Officer Gomez informed him that he could refuse to consent. Additionally, while Officers Gomez and Gembecki

---

[4] The Government's exhibits showing the various text messages between Mrs. Aponte and Defendant could be construed as evidence that the three conceived of a plan following Defendant's arrest to blame the signed consent form on the officers' threat. Of course, the innocent explanation is simply that Defendant wanted to ensure that his elderly grandparents conveyed all of the relevant information to his attorney. The Court need not decide whether the alleged threat was the product of such a plan, however; the Court has found that the only testimony regarding that threat was not credible and otherwise affords little weight to the affidavit testimony.

[5] Even if the Court credited Ms. Ortiz's testimony that she heard the officers tell Mr. Aponte he would lose his home, there is no evidence suggesting that Mr. Aponte's will was overborne by that comment. The fact of the threat by itself is insufficient to demonstrate that consent was not voluntarily given. *See United States v. Amery*, No. 02-cr-143 (GBD), 2002 WL 31027514, at *1 (S.D.N.Y. Sept. 10, 2002) ("In order to make a finding of involuntariness, the coercive governmental activity must overbear the defendant's will." (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991))). Officers Gomez and Gembecki testified that Mr. Aponte was very willing to discuss his hunting, deer heads, and his hunting rifles stored on Long Island. That testimony is consistent with what Special Agent Guzman testified Mr. Aponte told her. Ms. Ortiz's testimony also suggests that Mr. Aponte was not coerced. After gaining access to the apartment, she confirmed that Mr. Aponte was fine and then left him there, with the same officers who allegedly threatened him, while she went back downstairs. Moreover, Mr. Aponte's affidavit itself suggests that his will was not overborne. He states that he argued with the officers, explaining that he could not lose his apartment because he paid his rent. On these facts, the Court cannot conclude, even if the officers told Mr. Aponte that he could lose his apartment, that such a statement rendered Mr. Aponte's consent to the search involuntary.

described the events leading up to the signing of the consent form quite differently, both testified that officers did not commence a search of the apartment until after the consent form was signed. Under these circumstances, it was reasonable for the officers to have believed that Mr. Aponte voluntarily consented to the search.[6]

Because there is no credible evidence of coercion, the Court concludes that Mr. Aponte's consent to the search of his apartment was voluntary. The ammunition that the officers found during that search is therefore admissible.

### B. Statements to Law Enforcement

Defendant argues that his statements to the police should be suppressed because they were obtained in violation of his *Miranda* rights. "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Capers*, 627 F.3d 470, 474 (2d Cir. 2010) (quoting *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007)). Statements that are obtained by law enforcement in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), must be suppressed, even if they are given voluntarily. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). However, "[a] suspect is entitled to *Miranda* warnings only if he or she is interrogated while 'in custody.'" *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)). A person is interrogated for purposes of *Miranda* when questioning "reflect[s]

---

[6] Officer Gembecki testified that he could not recall whether he saw the ammunition on top of the TV stand before or after Mr. Aponte signed the consent form. There was no testimony, however, that the bullets were recovered prior to Mr. Aponte's consent. Additionally, Mr. Aponte had already allowed the officers into the apartment when Officer Gembecki observed the bullets. Therefore, even if the bag of ammunition was seen and recovered prior to Mr. Aponte's giving of consent to search the apartment, that ammunition is admissible under the plain view doctrine. *See United States v. Babilonia*, 854 F.3d 163, 179-80 (2d Cir. 2017) (Under the plain view exception, "a law enforcement officer may seize evidence without a warrant if (1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." (internal quotation marks and brackets omitted) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993))).

a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation "extend[s] only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302.

### 1. Defendant's First Statement

With respect to Defendant's first statement, the defense argues that it is inadmissible because Defendant was in custody at the time that he told the officers where the gun was located. The Supreme Court has established two discrete inquiries to determine whether a person is "in custody" under *Miranda*. *Parsad*, 337 F.3d at 181. First, courts consider "the circumstances surrounding the interrogation." *Id.* (quoting *Thompson*, 516 U.S. at 112). Then, in light of those circumstances, courts must determine whether "a reasonable person would have felt 'at liberty to terminate the interrogation and leave.'" *Id.* at 181-82 (quoting *Thompson*, 516 U.S. at 112-13). In considering the circumstances surrounding the interrogation, courts look at "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (citations omitted). "[I]n the absence of an actual arrest," a person may be deemed in custody where "law enforcement officials act or speak in a manner that conveys the message that they would not permit the [person] to leave." *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (quoting *Campaneria v. Reid*, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989)).

The Second Circuit has explained that "[t]he test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (quoting *Newton*, 369 F.3d at 672). "Although both elements are

required, the second is the 'ultimate inquiry' because a 'free-to-leave inquiry reveals only whether the person questioned was seized.'" *Id.* (quoting *Newton*, 369 F.3d at 672). In evaluating this second element, courts consider the circumstances of the police encounter, including, *inter alia*, "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 661-63 (2004)). In the absence of a formal arrest, "interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Newton*, 369 F.3d at 675.

Here, there was significant testimony regarding Defendant's location when he was outside on the sidewalk, about the number of officers that were with him, and whether they had him "surrounded." Defendant's liberty to leave at that point is not the key question here. Rather, the question is whether a reasonable person in Defendant's shoes would have felt free to leave at the time that officers asked him about the location of the gun—that is, once he was accompanied by officers into the apartment. Nonetheless, because Defendant was accompanied by officers during the entirety of their time at the apartment building, it is useful to evaluate the circumstances leading up to Defendant's questioning inside the apartment. *See United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017) ("To determine whether a suspect's freedom of movement was 'curtailed to a degree associated with formal arrest,' courts are required to conduct an objective examination of 'all the surrounding circumstances.'" (quoting *Faux*, 828 F.3d at 135)); *Parsad*, 337 F.3d at 181 (noting that a court must consider the circumstances in which the interrogation is made).

Ms. Ortiz and Ms. Martinez both testified that Defendant was "surrounded" by at least four officers while he waited outside. They both described Defendant standing with his back up against

the wall of the building, in the corner formed by the stoop and the building, while the officers had their backs to the street. This is largely consistent with Officer Gembecki's testimony. While Officer Gembecki testified that he recalled only Sergeant Pocalyko standing in Defendant's *immediate* vicinity, he stated that at least four officers were with Defendant, and that the officers were standing facing the building while Defendant's back was facing the building. Sergeant Pocalyko also testified that Defendant was standing "in the corner of th[e] staircase" that led up to the building's lobby door. Tr. at 145. According to Sergeant Pocalyko, only he and Officer Medina were near Defendant, and the other two officers were about fifteen feet away. Nonetheless, even accepting Sergeant Pocalyko's testimony as true, it is clear that Defendant was standing in a corner with at least two police officers standing in front of him, and another two officers nearby. Sergeant Pocalyko also testified that he more than likely frisked Defendant. Ms. Ortiz testified that the officers had double-parked their cars in front of the building when they arrived, and that testimony is uncontroverted.

It was while he was standing in the corner in this way, after likely being frisked, that Defendant received the news that ammunition had been located in the apartment—ammunition which Defendant later acknowledged as his. He was then escorted by the officers upstairs. Sergeant Pocalyko, Officer Gembecki, and Ms. Ortiz's testimony on this point was consistent: officers led Defendant upstairs (with officers walking both in front of and behind Defendant), and once inside the narrow hallway of the apartment, with at least three officers immediately next to Defendant and

other officers nearby, Defendant was asked about the location of the gun.[7] [8]

In light of the circumstances, the question of whether Defendant was in custody for *Miranda* purposes is a close one. The interrogation did occur in an apartment that could reasonably be considered to be Defendant's home. *See Newton*, 369 F.3d at 675 (noting that interrogation in the "familiar surroundings of one's own home is generally not deemed custodial"). The interrogation was of relatively brief duration, and the officers did not draw their weapons, yell at Defendant, or use handcuffs or other restraints. Nonetheless, the Court is hard-pressed to find that a reasonable person in Defendant's position would have felt free to terminate the encounter with the police and leave.

This is not a case in which police arrived at Defendant's home, found him there, advised Defendant that he was either free to leave or not under arrest, and then merely restricted his movement to a specific room or area of the apartment in order to protect the integrity of a search. *See, e.g.*, *Schaffer*, 851 F.3d at 174 (finding that defendant was not in custody when he was restricted to his office and his two requests to leave were denied because "a reasonable person would have viewed the agents' limited restriction on his freedom of movement as necessary to protect the

---

[7] Neither party argues in the briefing that the questions about the location of the firearm were not reasonably likely to lead to inculpating responses. During oral argument at the suppression hearing, counsel for the Government argued that the statements made by the officers when they were in the hallway with Defendant—that usually where there are bullets there is a gun and that, if the bullets were not his, that Defendant should admit that—"do not make it more likely that Mr. Tirado or an objective person in his position would have believed that he was in custody at that moment." Tr. at 406. Counsel for the Government continued, "It showed that it was possible that he could get off scot-free if he just maybe stayed silent or said it was his grandparents who had the bullets." *Id.* To the extent that this argument intends to challenge the nature of the questions asked by the officers, those statements, and any accompanying questions about the location of the gun, were likely to lead to an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 302 (1980) (noting that interrogations "extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response").

[8] The Court does not credit Ms. Ortiz's testimony that one of the officers held onto Defendant's elbow as he walked him upstairs to the apartment. Ms. Ortiz's recollection of that physical contact was challenged on cross-examination, at which point she conceded that she was not certain whether the officer was holding onto Defendant.

integrity of the ongoing search"); *United States v. Familetti*, 878 F.3d 53, 60-61 (2d Cir. 2017) (concluding that defendant was not in custody when he was interrogated at home and advised "several times that he was not under arrest and was free to leave"); *United States v. Akapo*, 420 F. App'x 42, 44 (2d Cir. 2011) (finding that defendant was not in custody when he was interrogated in his home and asked to stay near the doorway but "not handcuffed or frisked, he consented to a search of his apartment, he never indicated that he wanted to leave, and was not told that he could not leave").

Nor is this a case in which officers threatened to arrest everyone in the household, drew their weapons, or handcuffed Defendant. *See, e.g.*, *Newton*, 369 F.3d at 675-77 (finding that defendant was in custody when he was handcuffed in his home); *United States v. Ortiz*, 943 F. Supp. 2d 447, 455-56 (S.D.N.Y. 2013) (finding defendant in custody despite being interrogated in the familiar setting of his home when defendant was notified of outstanding bench warrants for his arrest, "three officers were clustered in [d]efendant's immediate vicinity," and officers threatened to arrest everyone in the apartment if defendant did not provide the requested information).

While this case falls somewhere on the spectrum in between, the Court finds that it presents circumstances more like those present in cases that courts have found to be custodial. Defendant, on parole and with prior charges for gun possession, was informed at the outset that the officers were there because they believed he had a gun in his apartment. Officers frisked Defendant and then kept Defendant backed into a corner outside while waiting for word from the officers upstairs. It was only after officers approached Defendant about ammunition they had located that Defendant was escorted into his home, with officers leading and trailing Defendant on the walk up. Inside the apartment, Defendant remained accompanied in tight quarters by several officers. Defendant knew that the officers had already found evidence—evidence which a reasonable person in Defendant's position would have recognized as incriminating. Although there is no testimony that officers told

Defendant they were going to arrest him, a reasonable person confronted with newly found evidence against him would understand that he was not free to leave. Moreover, the officers never told Defendant that he was free to leave, or would be free to leave after he accompanied them upstairs. To the contrary, Officer Gembecki made it clear during his testimony that he would not have allowed Defendant to leave after the ammunition was found.[9]

In light of the totality of the circumstances, a reasonable person in Defendant's shoes would not have felt free to terminate the encounter with the police and leave. *Cf. United States v. Satchel*, No. 06-cr-790 (AKH), 2007 WL 1411608, at *3 (S.D.N.Y. May 11, 2007) (collecting cases and noting that "[m]ost of the cases decided in this Circuit hold that a defendant interviewed for a brief period of time on familiar territory, such as his home or apartment building, *who has been told that he is 'free to leave,' who has not been patted down or frisked*, who has not observed officers brandishing weapons, *and* who was not threatened with arrest, is not in custody within the meaning of *Miranda* and its progeny" (emphasis added)). Therefore, Defendant was in custody for purposes of *Miranda* when he told officers where they could find the gun. Because the officers did not administer *Miranda* warnings prior to eliciting that statement, Defendant's first statement to the police must be suppressed.

---

[9] While the test for a custodial interrogation is an objective one and does not depend on the subjective beliefs of the officers, *Stansbury v. California*, 511 U.S. 318, 323 (1994), the Second Circuit has considered evidence that officers would not have allowed a defendant to leave if the defendant had tried. *See United States v. Ali*, 86 F.3d 275, 276-77 (2d Cir. 1996) (finding that defendant was in custody at an airport when he "was asked to step away from the boarding area, his travel documents were removed, [ ] he was surrounded by seven officers with visible handguns," and "law enforcement officials testified that they would not have allowed [defendant] to leave had he tried"); *see also United States v. Simmonds*, 641 F. App'x 99, 103 (2d Cir. 2016) (distinguishing *Ali* in part based on the officers' testimony in *Ali* that they would not have allowed the defendant to leave). The Court's conclusion does not rest solely, or even heavily, on Officer Gembecki's testimony that he would not have allowed Defendant to leave. It is, however, a consideration worth noting.

## 2. Defendant's Post-Arrest Statement

Defendant also moves to suppress the statement that he gave to law enforcement after he was formally placed under arrest and advised of his *Miranda* rights.

The Supreme Court has stated that, when a defendant has made a statement without having been given prior *Miranda* warnings, and *Miranda* warnings are then administered, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309. The Supreme Court has also recognized that such a rule may be abused by officers who purposefully withhold *Miranda* warnings, obtain a confession, administer *Miranda* warnings, and then obtain a second confession. *See Missouri v. Seibert*, 542 U.S. 600, 621 (2004). Therefore, prior to evaluating the voluntariness of a second statement given after *Miranda* warnings, courts "must address whether the officers employed a 'deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview,' and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred." *Capers*, 627 F.3d at 477 (quoting *Seibert*, 542 U.S. at 621). To determine if a deliberate, two-step strategy was employed, courts "review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *Id.* at 479. "[T]he burden rests on the prosecution to disprove deliberateness." *Id.*

The Second Circuit has explained that the analysis to be applied in the case of a Mirandized statement followed by an unwarned statement is "straightforward." *United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012). First, a court must determine whether "the initial statement, though voluntary, [was] obtained in violation of the defendant's Miranda rights[.]" *Id.* If the answer is yes, then the court must decide whether the Government "demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did not engage in

a deliberate two-step process calculated to undermine the defendant's Miranda rights[.]" *Id.* at 230; *see also Capers*, 627 F.3d at 479-80. If the Government is successful, "the defendant's post-warning statement is admissible so long as it, too was voluntary." *Moore*, 670 F.3d at 230. If, on the other hand, the Government does not carry its burden, "the post-warning statement must be suppressed unless curative measures (designed to ensure that a reasonable person in the defendant's position would understand the import and effect of the *Miranda* warnings and waiver) were taken before the defendant's post-warning statement." *Id.*

As the Court has already explained, the initial statement given by Defendant was elicited in violation of *Miranda*. Accordingly, the Court must determine whether the Government established by a preponderance of the evidence that the officers did not engage in a deliberate two-step interrogation. In making this determination, the Court is guided by the factors outlined in the plurality opinion in *Seibert*. *See Moore*, 670 F.3d at 230; *Capers*, 627 F.3d at 483-84. The Court is not limited to those factors, however, and must assess the evidence in its totality. *See Moore*, 670 F.3d at 230 n.3 ("The five *Seibert* factors . . . 'are by no means the only factors to be considered . . . . [Instead], a court should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness.'" (quoting *Capers*, 627 F.3d at 479)).

First, the Court notes that the Government presented no direct evidence of the officers' intent. None of the officers gave testimony regarding their motivation for asking Defendant about the location of the gun without first providing *Miranda* warnings. Therefore, there is no subjective evidence of their intent in failing to Mirandize Defendant at the apartment. *See Capers*, 627 F.3d at 479 (describing the officer's testimony as subjective evidence).

The only testimony by the officers that could shed some light on their intent does so inadequately. All of the officers testified that they knew in advance that Defendant resided at 2411 Valentine because they located him in a NYPD database. Officer Gembecki also testified that he

knew that Defendant was on parole. Therefore, it is reasonable to infer that the officers knew that Defendant was a convicted felon, and that any gun possession by him was unlawful. The officers also admitted that they all met with Sergeant Pocalyko before heading to the apartment building to discuss how they were going to proceed. While these facts could imply that the officers could have reasonably anticipated that any response to questioning by Defendant could incriminate him, these facts do not directly establish that the officers planned to use the first interrogation about the location of the firearm as a means to secure a second warned statement. Therefore, the Court concludes that was not the case. A review of the other evidence, in light of the *Seibert* factors, leads the Court to conclude that the officers did not engage in a deliberate two-step interrogation.

### a. Thoroughness of the First Interrogation

"The first factor considers 'the completeness and detail of the questions and answers in the first round of interrogation.'" *Moore*, 670 F.3d at 231 (quoting *Seibert*, 542 U.S. at 615). Here, the initial questioning was brief and limited only to the location of the gun. The officers did not ask Defendant about the ammunition (who it belonged to or how Defendant had acquired it). Nor did the officers request any detailed information about Defendant's possession of the gun (how he obtained it, how long he had possessed it, whether he had used it, etc.). The questioning only focused on locating the gun within the apartment. Therefore, this factor weighs against a finding of a deliberate two-step process. *See United States v. Williams*, 681 F.3d 35, 41-42 (2d Cir. 2012) (finding that questions aimed at locating missing guns and an additional suspect did not evince "a deliberate strategy of trying to elicit incriminating statements" which could later be used "to cross-examine the defendant after administering *Miranda* warnings").

### b. Overlap

The second factor examines "the overlapping content of the two statements." *Seibert*, 542 U.S. at 615. Where there is little overlap between the two interrogations, this factor weighs in favor of the Government. *See Moore*, 670 F.3d at 231.

Here, as mentioned, the first interrogation centered exclusively on locating the firearm. The second interview was much broader: the detectives asked Defendant about the ammunition, how he had obtained the gun and bullets, how long they had been in his possession, whether Defendant had ever used the gun or shown it to anyone else, and whether his grandparents knew that the gun was being stored in their apartment. While the detective at the precinct did ask Defendant about the location of the gun within the apartment, that was but one of the several other subjects of information about which Defendant was questioned. Any overlap between the two interviews was at most minor. *See Carter*, 489 F.3d at 536 (finding "almost no overlap" between two interrogations when the first interview involved the contents of a baggie found during a search and the second questioning involved the defendant's full confession).

### c. Timing and Setting

The timing and setting of the interrogations also weigh against a finding of a deliberate two-step approach. The first questioning took place inside of Defendant's apartment and "was spontaneous." *Williams*, 681 F.3d at 45. Although the officers anticipated that they would find a gun, they testified that they went to the apartment without a warrant and intent only on investigating the lead that they had received from the arrestee. It was not until the bullets were recovered that Defendant was asked about the whereabouts of the gun, and that questioning took place nearly immediately after the ammunition was recovered. The second interrogation, on the other hand, took place at the police precinct two and one-half to three hours later. Defendant was seated in a small interrogation room, offered water, and provided a cigarette. Defendant had already been

processed at the 52nd precinct, and a review of the video evidence shows that the detective questioning Defendant was referring to certain papers as he spoke with Defendant, papers which appear to list Defendant's prior arrests. *See* GX 108. Defendant was uncuffed during the interview and provided a full confession to the detective. These differences suggest that no deliberate two-step interrogation was being employed. *See Williams*, 681 F.3d at 44-45 (finding that the timing and setting of two interrogations did not suggest a two-step approach when the first questioning took place in a "somewhat frenzied" setting in a residential apartment and the second was orderly and took place at the stationhouse nearly two hours later).

### d. Continuity of Personnel

There was minimal "continuity of police personnel" in the two interviews. *Moore*, 670 F.3d at 232 (quoting *Seibert*, 542 U.S. at 615). Officer Gembecki asked Defendant where the gun was located at the apartment. While he was also present during Defendant's full confession later at the police precinct, he did not speak during that interview. *See* GX 108. Officer Gembecki was the only overlapping officer, and the detective that primarily questioned Defendant at the precinct had not accompanied the officers to the apartment building earlier. Therefore, this factor also weighs in favor of the Government.

### e. Continuity of the Questioning

Nearly three hours elapsed between Defendant's initial unwarned statement to the officers and the stationhouse questioning. Sergeant Pocalyko, the officer who transported Defendant from the apartment to the precinct, testified that he did not ask Defendant any questions on the way to the precinct. Sergeant Pocalyko also testified that Defendant did not say anything during that ride. Nor was Defendant taken directly to the 46th Precinct to be interviewed by the detective squad. Instead, he was first transported to the 52nd Precinct for processing, then taken to the 46th Precinct, where he waited for approximately an hour before his second interview began. The time

lapse, as well as the intermediate stop at the 52nd Precinct, were sufficient so that Defendant would "have reasonably believed that the second interrogation was not merely a continuation of the first." *Moore*, 670 F.3d at 232; *see id.* (finding that ninety-minute gap between interviews was sufficient to establish a discontinuity of the questioning); *Williams*, 681 F.3d at 45 (finding questioning was not continuous when there was nearly two-hour lapse between interviews).

In sum, a consideration of the *Seibert* factors and the totality of the subjective and objective evidence leads the Court to conclude that the Government has carried its burden in demonstrating by a preponderance of the evidence that officers did not engage in a deliberate two-step interrogation aimed at violating Defendant's Fifth Amendment rights.

### f.  Voluntariness of Defendant's Second Confession

Having concluded that no two-step process was employed here, the only inquiry left is whether Defendant's second statement to the detectives was voluntary. *See Williams*, 681 F.3d at 45; *Elstad*, 470 U.S. at 318.  Statements are voluntary when they are "the 'product of an essentially free and unconstrained choice by [their] maker.'" *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (alteration in original) (quoting *Schneckloth*, 412 U.S. at 225).  "'[C]oercive police activity' is a 'necessary predicate' to holding a confession constitutionally involuntary." *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).  However, police conduct that is "'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *Id.* (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).  Rather, a court must make "specific findings . . . that under the totality of the circumstances . . . the defendant's will was overborne by the [police] conduct." *Id.* (alterations in original) (quoting *Anderson*, 929 F.2d at 99).  "Such circumstances generally fall into 'three sets of circumstances:  (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" *Id.* (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988)).  Among characteristics of the

defendant that courts often consider are the defendant's background, education, maturity level, familiarity with the law, and intelligence. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995).

Here, Defendant does not argue that his waiver of his *Miranda* rights was anything but knowing and voluntary. Moreover, the video of the precinct interrogation shows that no coercion was used in eliciting a full confession from Defendant. The detectives sat calmly in the interrogation room, with only the questioning detective seated at the table with Defendant. The other two officers were seated against the wall. Defendant was not handcuffed and was offered water and provided with a cigarette. At certain points during the interview, Defendant himself made jokes, likening the DNA sampling to a pregnancy test. Defendant also engaged the interviewing detective in a light-hearted conversation about his vape pen. Absent any evidence of coercive techniques, or evidence that Defendant's will was overborne at any point during the interview, the Court is left with but one conclusion: Defendant's full confession was voluntary and is admissible.

### C. Suppression of the Gun

Because the gun was recovered as a result of Defendant's unwarned statement, Defendant moves to suppress the gun. "Evidence obtained by exploitation of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'" *United States v. Morales*, 788 F.2d 883, 885 (2d Cir. 1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). Physical evidence that is obtained based on a defendant's statements procured in violation of *Miranda,* however, is subject to a different analysis. "The purpose of the *Miranda* warnings is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *Capers*, 627 F.3d at 474 (quoting *Carter*, 489 F.3d at 534). One of those constitutional rights is that enshrined in the Fifth Amendment's Self-Incrimination Clause. That Clause provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const.

amend. V.  "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004).  Thus, the *Miranda* rule protects "a fundamental *trial* right." *Withrow v. Williams*, 507 U.S. 680, 691 (1993) (emphasis added) (citations omitted).

As the Supreme Court has explained, "police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*.  Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Patane*, 542 U.S. at 641.  "[A]t that point, '[t]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda* violation." *Id.* at 641-42 (second alteration in original) (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003)).  The Self-Incrimination Clause "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 636.  Therefore, there is "no reason to apply the 'fruit of the poisonous tree' doctrine of *Wong Sun*, 371 U.S. at 488," to physical evidence obtained as the result of an unwarned yet voluntary statement to the police. *Id.* at 642.

Like Defendant's second statement to the police, the Court finds that his first statement was voluntary, and not the product of coercion or trickery by the police officers.  Defendant states in his affidavit that an officer told him that he "had to show them where the gun was kept" or his grandparents would lose their apartment and be arrested.  Tirado Aff. ¶ 5.  Defendant claims that it was because of this threat that he "went upstairs and did as the NYPD directed." *Id.* ¶ 6. Defendant alleges that the threat was made while Defendant was outside with the officers, prior to their walk up to the apartment.  At that point, Officer Gomez, who allegedly made a similar threat to Mr. Aponte, had not engaged Defendant in any conversation and had not conferred separately with Sergeant Pocalyko since the officers' arrival at the apartment building.  Rather, the hearing testimony

suggests that Officer Gomez remained upstairs in the apartment until Defendant was escorted upstairs.

Together with the testimony from the defense witnesses, Defendant's statements regarding the threat suggest that the police officers devised a coercive scheme in order to locate the gun. To credit that theory, the Court would have to find that Sergeant Pocalyko and Officer Gomez conferred prior to their arrival at the apartment building regarding the threat that they would make, as the officers were separated from each other almost immediately after their arrival at the building. Or, at the very least, the Court would need to find that both officers knew that Defendant's grandparents were the legal residents of the apartment. However, the officers' testimony suggests that they were unaware in advance of who, besides Defendant, they would find at the apartment. They did not obtain a search warrant, and their plan, according to Officer Gembecki, was simply to go to the apartment to attempt to speak with *Defendant*. The testimony regarding the tip that the officers received from the arrestee was only that officers were told *Defendant* kept a gun at the apartment; not that his grandparents also resided there. Furthermore, Sergeant Pocalyko testified that Defendant said very little to him while they were outside, and there is no testimony that Defendant told the officers that the apartment was in his grandparents' names. In fact, Mrs. Aponte testified that Mr. Aponte is not even on the lease, so any prior investigation would likely not have alerted the officers to the fact that Defendant's grandfather lived in the home.

The Court does not credit such a theory. Rather, the Court finds that the officers did not threaten Defendant with his grandparents' arrest or homelessness. Nothing in the hearing testimony corroborates Defendant's statement regarding the threat. Sergeant Pocalyko testified that, while still outside with Defendant, he informed Defendant of the ammunition found inside the apartment, that he asked Defendant to accompany the officers upstairs, and that Defendant then walked up the stairs to the apartment with the officers. Officer Gembecki's testimony was consistent on that

sequence of events. On cross-examination, when Sergeant Pocalyko was asked if he told Defendant that his grandfather would be arrested if Defendant did not "go upstairs," the sergeant's response was an emphatic "No. No, sir." Tr. at 180-81. The Court credits the officers' testimony. Additionally, during the second recorded statement, the interviewing detective commented about how "cool" and compliant Defendant had been with the officers at the scene. Defendant had the opportunity at that time to explain to the interviewing detective that he had been coerced into giving up the location of the gun. But Defendant sat calmly at the interview table and made no mention of any threat.

Further, even if the threat had been made, there is no evidence to corroborate the inference that Defendant seeks to make in his affidavit—that his will was overborne by the officers' alleged threat. Defendant was thirty years old at the time. *See* GX 108. He had been arrested on several prior occasions and was on parole when the officers questioned him. *Id.* He was, thus, familiar with police interrogations, and there is no evidence that his mental or physical condition made him especially susceptible to coercion. While Defendant was in custody at the time he was asked about the location of the gun, he was in his home, a comfortable setting.

Apart from the affidavit statements regarding the threat against Defendant's grandparents, there is no evidence that suggests that Defendant was coerced or otherwise tricked into telling the officers where the gun was located. Considering all of the evidence, and particularly in light of Defendant's age and other characteristics, the Court concludes that Defendant's first statement was voluntary and not the product of police coercion or other conduct "intended to trick and cajole" Defendant into confessing in violation of his due process rights. *Haak*, 884 F.3d at 409. Because Defendant's statement regarding the location of the gun was voluntarily given, the fruit of that statement (the gun) is admissible.

### III. CONCLUSION

For the reasons stated herein, Defendant's motion to suppress is GRANTED in part and DENIED in part. Defendant's first unwarned statement to the police about the location of the gun is suppressed. Defendant's second statement at the precinct is admissible. The gun and ammunition are also admissible.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 21 and 31.

SO ORDERED.

Date: July 15, 2018
New York, NY

GREGORY H. WOODS
United States District Judge